Cooper, J.,
delivered tbe opinion of tbe court:
After having been general partners for about ten years, tbe complainant and defendant, then resident citizens of Memphis, entered into the following written agreement:
*124 ‘‘This article of agreement, made and entered into on this, the seventeenth day of August, 1868, by and between John Loague and Thos. Fisher, is for the following purposes and none other, to wit: Whereas, the said Thos. Fisher and J ohn Loague have for ten years or more, last past, been trading and doing business with the joint or common funds of each, and each devoting his time to the common benefit of both; and, whereas, the capital stock accumulated by their mutual efforts and industry is now invested in various ways, some in the name of Thos. Fisher and some in the name of John Loague, whilst each of them is equally interested in all the property owned by them jointly or separately: Now, therefore, this agreement is made with a view to- settling all the business of said Loague and Fisher up to this date, and determining the manner of future settlements either between themselves or their respective representatives. And it is agreed that the capital stock at present consists of the following property, to wit: A lease from the Hitcher estate of the ground and improvements on the north side of Linden street, between Causey and Hernando streets, being three cottages, in one of which the said John Loague resides; a lease on the lot at the northwest corner of Linden and Causey made by John Bain; a lot on the corner of Butler and Sixth streets, purchased at a chancery sale, but to which title has not yet been completed; a lot fronting one hundred feet on the north side of Linden street, between Causey and Hernando, known as the Witherspoon or Vaughn place, also-purchased at chancery, but the title of which has not been completed; all the capital stock of the Emmet Savings Bank, together with the increase of profits of the same, all the profits arising from the office of county court clerk, now held by John Loague; together with any and all other property, personal or real, that may be held by either party separately, and not named or enumerated herein, and it is agreed that the above named capital stock shall continue *125 to be used for tlie common benefit of each, and tbat each will devote his time and attention to the furtherance of the mutual interest of both, and that no salary shall be paid to either, and no charge or account of the expenses incurred by either in the business or for the family of either, shall be charged or accounted for by either during the continuance of the partnership, the intention of the parties being that each shall have for himself and his family a support out of the profits, and that at the death of either, or the dissolution of the partnership, all money and property on hand of every kind whatsoever shall be equally divided between the parties or their heirs. It is further agreed that Tlios. Fisher, or his representatives, is to receive out of the common fund twenty-five hundred dollars for cash due him for money advanced to the firm over his proportion, and which is due to him from this date, without interest. It is also agreed that the policy of life insurance held by John Loague in favor of his wife is not to be counted as any part of the common fund, but is to be her property absolutely as provided bv law. It is further and lastly agreed that the partnership may be dissolved by either party .at any time,-and a division of the property be had according to the terms and stipulations above set forth. In testimony whereof, the parties have hereto set their hands and seals this day and date above written.”
This instrument was signed by the parties, attested by two witnesses, and both proved and acknowledged before the deputy clerk of the county court. At the time of the execution of this agreement,- the complainant and defendant owned a lot on Linden street, and another on the corner of DeSoto and Nance streets, being the only realty to which they had absolute title. The title had been taken to- Fisher, but on. August 15th, 1868, two days before singing the articles of partnership, Fisher had, by deed, conveyed to Loague an undivided half of each lot, and the deed was *126 duly acknowledged and registered on tbe day tbe articles were signed.
In tbe year 1870, tbe complainant Avas president and defendant cashier of tbe Emmet Bank. On August tbe 25tb of that year, defendant wrote to complainant, tlien in New York, that be bad come to tbe conclusion to quit tbe bank, and go into some other business, and added: “It is advisable that we settle up as soon as you return.” Upon complainant’s return, in October, be and defendant applied to two of their friends.to aid then! in making a settlement. “I understood,” says one of these friends, “that all x>roperty was owned in common; that they desired to divide it, and begin an individual account against each for bis own and bis family's expenses.”
’ These friends required each of tbe parties to give them tbe necessary authority in writing, Loague’s letter to them is dated October 28th, and Fishei’-s November, 1870. Tbe latter says that their endeavors to make a settlement will have bis hearty co-operation,- and be suggests that a division of tbe property would be better than a sale, but is willing to either. Loague writes: “J\!r. Fisher and I are owners jointly of tbe following real and leasehold property, which we desire your good judgment to assist us in dividing.” Then after briefly specifying tbe lots and leaseholds, be says: “Our personal property will be divided after this matter is disposed of. Your partition will not be binding on us. If we approve of tbe division we will draw lots, and give warranty deeds to> each other, our wives joining as in tbe deeds. Our only aim is to make a fair and equitable division of everything we possess jointly.” Their two friends met together, and made estimates of their property, real and personal, and on November tbe 4th, submitted in writing tbe result. They divided tbe real and leasehold property of each party with a valuation -of each item. Both of these gentlemen testify that their valuation was entirely satisfactory to both parties so far as tbe realty and lease- *127 bold were concerned, but- that Loague expressed a* doubt whether Fisher had not withheld some articles of jewelry which ought tO' have been included in the list of his personalty. Both of them further deposed that the parties drew papers from a hat to' determine their shares in the property divided, and that Loague drew the lot containing the two leasehold estates, and Fisher drew the lot containing the two lots on Linden street and at the corner of LeSot.o and Vance streets above mentioned. Both parties went into possession of the property thus alloted to them respectively, and continued in the undisturbed possession thereof until the commencement of this litigation in 1879. One of their friends, who was a lawyer, drew up for them formal deeds of partition of the property to be executed by each to the other for his respective allotment, which, however, were never executed. Each party made improvements on his part of the realty, and received the rents and profits. "When the leaseholds fell' in, Loague bought the fee of the realty, taking the title to one piece in the name of his wife, and the other to himself.
The only property not included in the settlement thus made consisted of the interest of the complainant and the defendant in the Emmet Bank, of which they were the exclusive owners, and in the "Witherspoon or Vaughn lot, which was considered as a part of the assets of the bank, and to which they had at the time no title, the sale at which they had bought it, having been contested and eventually set aside. The lot was resold under the orders of the court, and again bought by complainant and defendant with the money paid in on the first bid. This property was after-wards improved by Loague in 1876, and occupied by him. It is conceded by both parties to be still common property.
The parties continued to own the Emmet Bank, Fisher being president and Loague cashier. On June 1st, 1872, during Fisher’s absence at New York, Loague caused a readjustment of certain accounts on the books of the bank *128 to be made by tbe bookkeeper, the result being a balance of apparent earnings of $78,451.91, one-half of which was carried to the individual credit of each of the parties. Fisher acquiesced in what was thus done, and each x^arty afterwards drew upon the individual account thus created for his own purjooses as he chose, until the whole amount was exhausted. On June 30th, 1873, Loague and Fisher again divided apparent xrrofits, amounting to $15,171.86, each being credited with one-half thereof, and used the same, each for his own purposes. In the meantime Loague, after an unsuccessful race for the position of mayor of the city of .Memphis, was twice elected to that office, served a term in the legislature of the state, went into business, and also obtained a license and x>racticed as a lawyer. The money received by way of salary, or otherwise, he used-as he saw proper, part of it being employed in improving the 'Witherspoon lot. He seems to have made some efforts to get back to the position of cashier of the bank, but Fisher declined to remove the acting cashier so as to make room for him. There was no division of the profits or funds of the bank after the division of June, 1873.
In this situation of affairs, on November 18th, 1878, Loague tiled a petition against Fisher in the probate court of Shelby county, alleging that he tras the owner in feo of an undivided half interest in the two lots on Linden street and the corner of DeSoto- and Vance streets; that Fisher' had conveyed to him the undivided half interest in 1868, but liad made no return to him of the rents; that the lots were not susceptible of division, and asking for a sale for division and an account of rents. Thereitpon, on January 2d, 1879, this bill was filed to enjoin those proceedings, to have the title of the parties quieted to the property alloted .to' each in 1870, to have an adjustment of ail equities between the parties, and for a final settlement and division. Loague answered the bill, and filed his answer as a cross bill, insisting that there never had been a *129 division of any of the property and effects of tire partnership, that the original agreement embodied in the writing of 1868 still continued in full force, and that he was entitled to a settlement upon the basis of its terms, but agreeing to such a settlement.
On final hearing the chancellor found that the parties were partners as set out in the article of August 17th, 1868, but that there had been a modification of the terms of their contract by what was done under the division of 1870, and the subsequent division of the bank profits in 1872 and 1873, and the acquiescence and action of the parties, at least to the extent of requiring each party to account for all moneys drawn by him for other than partnership purposes, and that each should afterwards be charged for all moneys drawn on family expense account.
The decree vests title to the property in accordance with the division in 1870, and orders an account upon the basis of the agreement as modified by the decree. Each party is to be charged with moneys drawn from the bank unless he can show that they were expended for partnership purposes. Fisher is not to be charged with any loss in managing the bank, nor allowed any salary, and is to be charged with funds received for services as guardian and as administrator. Loague is charged with his salary as mayor and member of the legislature, and funds received from other business or as attorney, but is to be credited with so much of his salaries as proof may show he used in permanent improvement of the partnership property.
Both parties appealed.
The referees were of the opinion that the universal partnership was terminated by the division in 1870, and thereafter the partnership of the parties was limited to the individual property; that neither party was to be held accountable for funds set apart to him, nor for sálaries, or compensation for individual services as guardian, admin - *130 istrator, or attorney thereafter, nor for any individual earnings or investments unless used in partnership investments; nor was there to be any account- for family expenses. In other respects, they report in favor of affirming the chancellor’s decree. Both parties excepted to the report, the complainant because he was not allowed any salary as president of the bank, and the defendant on various grounds which opened the case.
The defendant’s position is that up to the filing of the bill there never had been a dissolution of the partnership, nor a division of any part of the partnership property. He further contends that even if there was a division, and the partnership still continuing, each partner would hold the property or money received in the division precisely as before, and the terms of the partnership agreement would attach thereto, and to all profits and accumulations subsequently acquired. The position itself, as well as the agreement in support of it, rests upon the assumption that there never has been a dissolution of the partnership. This is a question of fact.
The agreement, a very unusual one, is for a universal partnership. The agreement provides “that the partnership may be dissolved by -either party at any time,” and the partnership is of that peculiar character that any modification must at once end it, for, otherwise, the modification would be nugatory, and as contended for by the defendant, the partnei’ship would still continue in spite of the positive intention of the parties to the intent of the modification, which would be in direct conflict with the right reserved to either partner, and in fact with the right of either partner in any partnership, where there is no stipulation to the contrary, to terminate the partnership at- pleasure. Any modification of a universal partnership, to be effectual according to the intent of the parties, must destroy the universality, and create a new contract which may consist of the old agreement with the modification. This is what the com *131 plainant claims, and. the defendant is simply mistaken when he says that complainant admits, even in his bill, the existence of the partnership. On the contrary, the complainant contends that the universal partnership was terminated by the division of the property in 1870, and a new partnership created, which was limited to the Emmet Bank, its property and franchises, and that the profits of the bank were divided between the parties in 1872 and in 1873. They are still equal partners in the bank, its assets and subsequent profits, if any. "What, then, was the effect of what was done in 1870? There cannot be a doubt that the parties then intended, the defendant himself being the first in the movement, to divide their joint property, terminate their universal partnership, and thereafter manage their property and do business as independent individuals. “I understood,” says their friend and legal adviser who aided in making the division, “that all property was owned in common, and that they desired to divide it, and begin an individual account against each for his own and his family expenses.” In other words, the parties manifestly desired and intended to bring to an end their previous community of goods and interests, and thereafter live independently of each other. The division of property then made was, as we have seen, entirely satisfactory, each going and remaining in possession of his allotment, improving and managing it to suit himself, and receiving exclusively tlio rents and profits. The valuation of the personal property held by each, if not altogether satisfactory to defendant, was acquiesced in. The Emmet Bank could not be divided, and was left as common property, and the Witherspoon lot, the only other item of joint effects, was, as their friend and lawyer tells us, left as a cash asset to be considered as part of the bank capital.
The written communication of both the complainant and the defendant to their friends who made the valuation and division of their property contained the same remark, *132 that the division, would, not be binding upon them unless approved. Loague adds: "If we approve of the division, we will draw lots and give warranty deeds to each other, our wives joining us in the deeds.” Their lawyer friend had advised them that deeds from each to the other for his share was essential to a valid partition. Everything else was done except to execute the deeds. The partition was therefore defective, and might have been impeached by either of the parties within the time allowed by law, subject to the rule of equity in such cases of making a subsequent partition conform as nearly as possible with the partition made by them in parol. Tyner v. Fenner, 4 Lea, 474. But the parties have acquiesced in what was done, although Loague may have refused to execute a deed of partition and insisted that the division was not binding until the title had been perfected by statute of limitations. The seizin and possession, as well of each part as of the whole, are in each tenant in common of land, and when adverse may invest the one so holding with an indefeasible title to the whole. King v. Rowan, 10 Heis., 675. Adverse possession by one tenant in common for a sufficient length of time would be evidence of ouster, and if continued long enough, would vest title. Saunders v. Hackney, 10 Lea, 194, 203; Hubbard v. Wood, 1 Sneed, 279.
There can be no doubt of the continuous adverse possession by complainant of the land allotted to him for more than seven years before the filing of defendant’s cross bill in this case, and even before the filing of his petition in the probate court, if that be treated as a suit for the recovery of the land. These lands therefore had become vested in the complainant by indefeasible title-, and the universal partnership must be treated as ended as to them from November 4, 1870.
The joint and equal interest of the complainant and defendant in the Emmet Bank and the Witherspoon lot still continues, but how? The universal partnership was put *133 an end to by the voluntary agreement of the parties. Their joint interest in the bank and lot were merely those of co-owners or ordinary partners. Of course all the profits derived from the property would also belong to them jointly until divided, and might be followed into any investment made therewith as in ordinary cases of partnership or fiduciary relation. But neither had any longer any claim to the personal earnings or incidental investments of the other. This would be so as matter of law as soon as the universal partnership was voluntarily terminated by either. But the testimony leaves no doubt that such was the intention of the parties, and the subsequent conduct of both parties was in accord, except in one respect. Loague never proposed to account, nor perhaps until recently thought of accounting to the complainant for his salaries as mayor of Memphis or member of the legislature, or for his profits in business, but he did invest some of his earnings in the improvement of the Witherspoon lot, upon which he moved with his family, and has since lived. The referees report that he should not be allowed therefor, and inasmuch as he had the use of the property with which he is not to be charged, the report is probably correct, and as we concur with the referees in the conclusion that the complainant should not be allowed any salary as president of the bank, the result reached is as near an approximation to justice between the parties as can well be attained. We think the salary should not be allowed, because the original agreement provides that “no salary should be paid to either,” and no other arrangement was made by the parties, and because there is proof tending to show that defendant offered to act as cashier of the bank, and was not permitted by the complainant to- do so.
The exceptions to the report of the referees will be disallowed, and a decree entered in accordance with the report modifying the chancellor’s decree. The cost of this court will be paid equally by complainant-and defendant, and the case remanded for further proceedings.